AO 106 (Rev. 04/10)  Application for a Search Warrant                    Authorized and Approved Date: s/Nick Coffey 02/26/2023

# UNITED STATES DISTRICT COURT

for the

Western District of Oklahoma

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>THE CELLULAR DEVICE ASSIGNED CALL NUMBER (510) 372-3717<br>WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY /<br>ELECTRONIC SERIAL NUMBER 310260030326953 IN THE<br>CUSTODY OR CONTROL OF T-MOBILE | )<br>)<br>)<br>)<br>)<br>)     Case No. M-24- *180* -SM |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A.

located in the _____ District of _____ **New Jersey** _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

    ☑ evidence of a crime;

    ☐ contraband, fruits of crime, or other items illegally possessed;

    ☐ property designed for use, intended for use, or used in committing a crime;

    ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 21 U.S.C. §§ 841, 846 | Distribution and Possession of CS with Intent to Distribute; Drug Conspiracy |

The application is based on these facts:

See attached Affidavit.

    ☑ Continued on the attached sheet.

    ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Michael Adams, Special Agent FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  2-26-24

_____
*Judge's signature*

City and state:  Oklahoma City, Oklahoma

SUZANNE MITCHELL, U.S. Magistrate Judge
*Printed name and title*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH THE CELLULAR DEVICE ASSIGNED CALL NUMBER (510) 372-3717 WITH INTERNATIONAL MOBILE SUBSCRIBER IDENTITY / ELECTRONIC SERIAL NUMBER 310260030326953 IN THE CUSTODY OR CONTROL OF T-MOBILE** | Case No. *M-24-180 - SM* <br><br> **Filed Under Seal** |

### AFFIDAVIT IN SUPPORT OF
### AN APPLICATION FOR A SEARCH WARRANT

I, **Michael Adams**, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.    I make this affidavit in support of an application for a search warrant for information associated with a certain cellular device assigned call number **(510) 372-3717** (the "**Subject Account**") that is in the custody or control of **T-Mobile**, a wireless communications service provider that accepts process at 4 Sylvan Way, Parsippany, New Jersey 07054.  As a provider of wireless communications service, **T-Mobile** is a provider of "electronic communications service," as defined in 18 U.S.C. § 2510(15).

2.    The information to be searched is described in the following paragraphs and in **Attachment A**.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(c)(1)(A) and Federal Rule of Criminal Procedure 41 to require **T-Mobile** to disclose to the government the information further described in Section I of **Attachment B**.  Upon receipt of the information described in Section I of **Attachment B**,

government-authorized persons will review the information to locate the items described in Section II of **Attachment B**.

3.    Because this warrant seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definition of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the requested warrant is designed to also comply with the Pen Register Act, *see* 18 U.S.C. §§ 3121–3127. The requested warrant therefore includes all the information required to be included in an order pursuant to that statute, including a certification from an attorney for the government that the information likely to be obtained by the requested pen register and trap-and-trace device is relevant to an ongoing criminal investigation. *See* 18 U.S.C. § 3123(b)(1). That certification is attached as **Attachment C**.

4.    In sum, this affidavit is made in support of an application for three distinct items: (1) a pen register and trap-and-trace device on the **Subject Account**, pursuant to 18 U.S.C. § 3121–3127; (2) a "ping" on the **Subject Account**, pursuant to 18 U.S.C. § 2703 and Fed. R. Crim. P. 41(c); and (3) an order for historical and prospective cell site data for the **Subject Account**, pursuant to 18 U.S.C. § 2703(d).

5.    I am a federal law enforcement officer within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I have been a Special Agent with the Federal Bureau of Investigation (FBI) (the **Investigating Agency**) since March 2015. As a Special Agent, I have participated in and

2

conducted investigations involving violations of federal criminal laws to include the distribution of and conspiracy to distribute controlled substances. I am familiar with the investigative techniques used in these investigations such as the use of undercover agents, the use of cooperating source(s), the analysis of telephone tolls and pen register information, search and seizure warrants, Grand Jury investigations, and the interception of wire and electronic communication. In this capacity, my responsibilities include the investigation of possible violations of federal law. During my career, my investigations have included the use of various surveillance techniques and the execution of various search, seizure, and arrest warrants.

6.    The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

7.    Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 846 (the **Target Offense(s)**) have been committed by Jorge Raul Vega Garcia (**VEGA**) (the user of the **Subject Account**) and other known and unknown co-conspirators. There is also probable cause to search the information described in **Attachment A** to assist and aid in the location of **VEGA** as further described in **Attachment B**.

8.    The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. §§ 2711 & 3127. Specifically, the Court

3

is a district court of the United States that has jurisdiction over the offense being investigated. *See* 18 U.S.C. §§ 2711(3)(A)(i) & 3127(2)(A)(i).

## PROBABLE CAUSE

9.       Law enforcement first became aware of Oscar Hernandez (Hernandez) and the drug trafficking organization (the "DTO") described herein in 2018 during an investigation targeting the Irish Mob Gang ("IMG"), an Oklahoma prison gang that was trafficking drugs across the state of Oklahoma and beyond. During the investigation, which utilized Title III wiretaps, law enforcement intercepted Hernandez and identified him as one of the IMG's principal sources of supply of methamphetamine. These IMG members and their associates were ultimately indicted and convicted. *See United States v. Velasquez*, CR-18-260-SLP. Next, from roughly 2019 to 2021, law enforcement began targeting Hernandez's distribution network. During that portion of the investigation (Phase 1), investigators uncovered a massive methamphetamine distribution network led by Hernandez.

10.      Phase 1 established that Hernandez, who was residing in San Luis Potosi, Mexico, relied on trusted family members and confidants in Oklahoma to conduct the day-to-day operations of the DTO. Those individuals in Oklahoma distributed thousands of pounds of methamphetamine to customers of the DTO and collected millions of dollars in drug proceeds—all at Hernandez's direction. Prior to that distribution, the crystal meth was converted from its liquid form at multiple clandestine laboratories in rural Oklahoma. While these labs were owned by Hernandez's family members and co-conspirators, the individuals that worked at the labs (hereafter referred to as the "lab workers") appeared to

report to the ultimate source of supply, whom cooperators identified as "Mamisan". Law enforcement also found evidence indicating "Mamisan" was the individual responsible for coordinating the shipments of liquid methamphetamine from Mexico to Oklahoma; the investigation established that the methamphetamine was being transported in the gas tanks of a semi-truck, which was owned by and registered to a company called DGC Express. DGC Express, in turn, listed its registered agent as Nelly Gutierrez (NELLY), according to the Texas office of the comptroller. Once the semi-truck arrived in Oklahoma, it was received by the lab workers at a private location, where the liquid methamphetamine could be extracted, placed into transportable containers, and ultimately taken to the clandestine lab location for conversion.

11.     As a result of Phase 1 of the investigation, federal charges were filed in the Western District of Oklahoma against more than forty persons, including Hernandez (*see United States v. Hernandez*, CR-21-76-SLP), members of his incarcerated customer base (*see United States v. Baswell*, CR-21-77-SLP), and two truck drivers (*see United States v. Cedillo*, CR-21-288-SLP, *and United States v. Lucio*, CR-21-289-SLP). In addition, law enforcement executed over a dozen search warrants, including at the liquid methamphetamine delivery location and two clandestine labs used by the DTO. Law enforcement also made significant drug and money seizures, including over one thousand pounds of methamphetamine and more than $1 million in U.S. currency. At the time, this coordinated effort significantly disrupted Hernandez's and the overall DTO's operation. It was not until the fall of 2022, however—with the help of a newly developed confidential

human source (CS1)[1]—that law enforcement launched the second phase of the investigation into the DTO described herein (Phase 2).

12.     Since Phase 2 of the investigation launched, law enforcement has identified and dismantled the DTO's meth conversion lab at 980801 S Stage Coach Drive, Wellston, Oklahoma (the "Wellston Property"). On December 8, 2023, the FBI executed a search warrant there, seizing more than 100 gallons of liquid meth and more than 50 lbs. of crystal meth, which appeared based on my training and experience to have been recently converted from liquid form.[2] In addition to these seizures, law enforcement arrested Edgar Rodriguez Ontiveros (Rodriguez) and Jose Equihua (Equihua), the DTO's lab workers at the time, on site.

---

[1]     CS1 was arrested by law enforcement for drug related crimes. CS1 thereafter agreed to assist law enforcement and began providing information relating to this investigation in the fall of 2022. Prior to this last arrest, CS1 had been convicted of drug related crimes in 1998 (manufacturing), 2007 (trafficking), and 2021 (possession). CS1 furnished information to law enforcement in hopes of receiving consideration for his/her most recent pending charges. CS1 has also received $1,000 in monetary compensation to date for his/her cooperation. The information provided by CS1 has been corroborated through other investigative techniques including physical surveillance, consensually recorded conversations, and telephone analysis. Information provided by CS1 has been reliable and I am unaware of any knowingly false information furnished by CS1. Information attributed to CS1 herein, unless otherwise noted, was obtained by CS1 through his/her personal observations or conversations with targets of this investigation and their associates.

[2]     Portions of both the suspected crystal meth and liquid meth (which appeared to be in various stages of the conversion process) were field tested on scene, resulting in positive presumptive tests.

13.     Following this search warrant, it appears the DTO has made several changes in an effort to thwart the current investigation.  GPS location data on one of the DTO's primary distributors, Ray David Lara (Lara), suggests that the group has moved the transfer/delivery location (formerly a warehouse at 701 SE 29th St.) to a still-unknown location.  Additionally, physical surveillance suggests that the DTO also appears to have moved its meth conversion lab from the Wellston Property to 21845 Lilly Drive, Tecumseh, Oklahoma ("the Lilly Property").  And lastly, the DTO obtained two new lab workers.

14.     These two new lab workers, however, which law enforcement identified through surveillance on the Lilly Property, appear to have been arrested on state drug charges in Washington County, Texas, on January 26, 2024—thus leaving the DTO again without lab workers.  That said, I know based on my training and experience with this particular investigation that this DTO will not be deterred by routine law enforcement action and will undoubtedly replace the lab workers previously arrested in Texas—which is in fact what I believe law enforcement has observed in February 2024.

15.     I believe that law enforcement has identified a new lab worker for the DTO, as well as his phone number (the **Subject Account**).  DEA Atlanta was monitoring a WhatsApp pen register on Mexico-based phone number 52-558-134-5579—which they believe belongs to the ultimate source of supply for the DTO[3], responsible for liquid meth

---

[3]     Following Rodriguez's arrest, law enforcement searched the contents of his cell phone and found conversations between Rodriguez and someone using 52-332-829-0865

7

deliveries to Oklahoma and Georgia, whom the 2021 investigation identified as "Mamisan". On February 12, 2024, this Mexican phone number had contact with the **Subject Account**. Law enforcement then obtained account information for the **Subject Account** number and found that it was subscribed to "Jorge Vega." Law enforcement also obtained transactional records for the **Subject Account** and found that, not coincidentally, on February 12, 2024, the user of the **Subject Account** also tried to contact (for apparently the first time) the DTO's primary distributor and leader of the Oklahoma City cell—Lara, at (405) 551-5113. In addition, on February 17, 2024, law enforcement observed, via surveillance camera, Adrian Perez—another distributor for the DTO—moving out of his apartment at 1402 SW 59th Street, Oklahoma City, Oklahoma. Law enforcement also observed an individual helping him, who then appeared to be moving into this same apartment. Law enforcement was able to observe the license plate on the vehicle this individual was using on February 23, 2024, as California tag 8TDZ107. This vehicle is registered to a Jorge Vega Garcia (i.e., **VEGA**), which led law enforcement to believe the user of **Subject Account** and the driver of this vehicle, who is in contact with both "Mamisan" and Lara, is in fact **VEGA**. Based on my training and experience with this

---

that appeared, based on the context of the conversations, to be the individual Rodriguez was reporting to in the DTO. Law enforcement has also conducted a common call analysis on 52-332-829-0865 and identified the likely new number for the ultimate source of supply, previously identified as Mamisan: 52-558-134-5579.

8

particular investigation, and the facts described above, **VEGA** clearly fits the modus operandi of a new lab worker arriving to work for the DTO.

16.    I know based on my training and experience that sophisticated DTOs, like the one described herein, necessarily rely on cellular communication to coordinate their criminal activity, particularly when that criminal activity involves an interstate transport of liquid methamphetamine and rural clandestine meth labs such as the Wellston and Lilly Properties.  I also know that the lab workers will likely keep a cellular telephone on their person when visiting locations associated with the DTO—thereby making the requested authorization sought herein useful in tracking and identifying past and future locations visited by **VEGA** up to and including the Lilly Property or any other lab for that matter. Given this investigation is ongoing and **VEGA** appears to be involved in the DTO's conversion activities, I believe that this information will continue to aid law enforcement in further investigating the DTO and identifying the various locations involved in the transportation of liquid methamphetamine.

17.    Through administrative subpoenas, I have confirmed that **T-Mobile** provides service for the **Subject Account**.  **T-Mobile's** information lists "Jorge Vega" as the "Customer Name" for the **Subject Account**.

18.    In my training and experience, I have learned that **T-Mobile** is a company that provides cellular communications service to the general public.  I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they

provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be ten (10) or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

19. Based on my training and experience, I know that **T-Mobile** can collect cell-site data about the **Subject Account**. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; (5) the cell tower roundtrip network measurements from tower to device and back to tower, commonly referred to as Timing Advance data; and (6) the duration of the communication. I also know that wireless providers such as **T-Mobile** typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

10

20.    Based on my training and experience, I know each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers—as transmitted from a cellular device to a cellular antenna or tower—can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content.

21.    Based on my training and experience, I know wireless providers such as **T-Mobile** typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as **T-Mobile** typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may assist in locating and tracking **VEGA**, as well as identifying additional co-conspirators.

11

22.     Based on my training and experience, the combination of both historical and prospective location information is helpful in locating individuals.  For example, I believe that historical location data will provide information on other places **VEGA** has visited on behalf of the DTO.  I know from training and experience that the historical location information from cellular phones can help establish a pattern of life, while prospective location information—including cell-site information, phone pings, and timing advance measurements/distance-to-tower measurements—can help provide more precise real-time information regarding the location of the **Subject Account's** user.  To help ensure that **VEGA's** movements are tracked, I am requesting precise location information for the next forty-five (45) days for the **Subject Account.**

**<u>AUTHORIZATION REQUEST</u>**

23.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Fed. R. Crim. P. 41.  The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in **Attachment A** for each communication to or from the **Subject Account,** without geographic limit, for a period of forty-five (45) days pursuant to 18 U.S.C. § 3123(c)(1).

24.     I further request, pursuant to 18 U.S.C. § 2703(b)(1)(A), that the Court find that the government is not required to provide notice of this warrant to the subscriber, customer, or person who was monitored.  I also request, pursuant to 18 U.S.C. § 3123(d),

12

that **T-Mobile** be ordered not to disclose to the listed customer or any other person the existence and/or use of the pen register and trap-and-trace device sought herein. Additionally, there is reasonable cause to believe that providing immediate notification of the warrant to the subscriber, customer, or person who is being monitored may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber, customer, or user of the **Subject Account** would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 2705(a)(2). Therefore, I request that the Court order **T-Mobile** not to notify any other person of the existence of this warrant and order for a period of one year from the date the requested warrant is issued, except that the service provider may disclose this warrant and order to an attorney for the service provider for the purpose of receiving legal advice. As further specified in **Attachment B**, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

25.     I further request that the Court direct **T-Mobile** to disclose to the government any information described in Section I of **Attachment B** that is within its possession, custody, or control. Because the warrant will be served on **T-Mobile**, who will then

13

compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

26.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed for a period of one year from the date the requested warrant is issued, or until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents as their premature disclosure may jeopardize this investigation.

Respectfully submitted,

Michael Adams
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on February 26, 2024

SUZANNE MITCHELL
UNITED STATES MAGISTRATE JUDGE

14

## **ATTACHMENT A**

**Property to Be Searched**

1.  The cellular telephone assigned call number (510) 372-3717 with International Mobile Subscriber Identity / Electronic Serial Number 310260030326953 (the **"Subject Account"**) whose wireless service provider is T-Mobile (the "Provider"), a company that accepts process at 4 Sylvan Way, Parsippany, New Jersey 07054.

2.  Records and information associated with the **Subject Account** that is within the possession, custody, or control of the Provider.

## ATTACHMENT B

### Particular Things to Be Seized

**I.    Information to be Disclosed by the Provider**

To the extent that the information described in **Attachment A** is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the **Subject Account** listed in **Attachment A:**

a.    The following information about the customers or subscribers associated with the **Subject Account** for the time period January 1, 2024 to the present:

   i.    Names (including subscriber names, user names, and screen names);

   ii.    Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.    Local and long-distance telephone connection records;

   iv.    Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.    Length of service (including start date) and types of service utilized;

   vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity

Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.  Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address);

viii.  Means and source of payment for such service (including any credit card or bank account number) and billing records;

ix.  All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the **Subject Account**, including:

1.  the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses);

2.  information regarding the cell tower and antenna face (also known as "sectors" through which the communication were sent and received; to include the cell tower roundtrip network measurements from tower to device and back to tower, commonly referred to as Timing Advance data (RTT, PCMD, TrueCall, LOCDBOR, etc.).

b.  The following information about the customers or subscribers associated with the **Subject Account** for a period of 45 days from the issuance of the warrant, including:

i.  Names (including subscriber names, user names, and screen names);

ii.  Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.  Local and long-distance telephone connection records;

iv.  Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.  Length of service (including start date) and types of service utilized;

2

vi.    Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.    Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.    Means and source of payment for such service (including any credit card or bank account number) and billing records.

c.    Prospective information about the location of the cellular phone associated with the **Subject Account** for a period of 45 days (during all times of day and night) from the issuance of the warrant, including:

i.    E-911 Phase II data;

ii.    GPS data to include cell tower sector information;

iii.    Latitude-longitude data;

iv.    Other precise location information, including engineering data to include but not limited to RTT records, PCMD records, Location Database of Records (LOCDBOR) and/or NELOS records, TrueCall records, and all other records containing timing advance measurements and distance-to-tower measurements for all technologies (CDMA, GSM, UMTS, LTE, etc.); and

v.    Pen Register / Trap and Trace device with prospective cell site information or data about which "cell towers" (i.e., antenna towers covering specific geographic areas) and "sectors" (i.e., faces of the towers) received a radio signal from the **Subject Account** during any voice, SMS, and/or data transmission, including but not limited to engineering data which would include RTT records, PCMD records, Location Database of Records (LOCDBOR) and/or NELOS records, TrueCall records.

3

**II.      Information to Be Seized by the Government**

All information described above in Section I that would assist and aid in locating any evidence of violations of **Target Offenses**.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by T-Mobile in order to locate the things particularly described in this Warrant.

## ATTACHMENT C

### 18 U.S.C. § 3122 Certification

In support of this application, and pursuant to 18 U.S.C. § 3122, I state that I am an "attorney for the Government" as defined in Rule 1(b)(1) of the Federal Rules of Criminal Procedure. I certify that the information likely to be obtained from the requested warrant is relevant to an ongoing criminal investigation being conducted by the Investigating Agency of the Target Subject(s) for violation(s) of the Target Offense(s).

I declare under penalty of perjury under the laws of the United States of America that the foregoing paragraph is true and correct.

02/26/2023
DATE

Nick Coffey
Assistant United States Attorney